[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
 STATEMENT OF THE CASE
The plaintiff is a former employee of the defendant Ecoair Corp and the defendant Peter S. Knudsen, Jr. was and is its president.
In a four count complaint, the plaintiff seeks damages and other relief, alleging wrongful termination and breach of verbal employment terms and conditions against the corporation in counts one and two. In the third count, the plaintiff alleges interference with employment relationships against the defendant Knudsen. The fourth count, alleging breach of fiduciary obligation against Knudsen was dismissed on defendant's motion at the conclusion of the plaintiff's case.
The defendant Knudsen has interposed a counterclaim in the amount of $78,000, representing a loan in that amount made to the plaintiff during CT Page 11890 1996.
The plaintiff relies on a 1995 employment contract which he claims replaced a 1993 contract. If the 1993 contract is found to be the controlling document, then a letter dated September 11, 2000 (Exhibit W) to the plaintiff would be effective as a non-renewal of that contract, effectively limiting any recovery by the plaintiff to the terms of 1993 contract.
 DISCUSSION I. The 1995 Employment Agreement
The 1993 employment agreement (Exhibit A) contains this language in paragraph 15:
 "No modification, amendment, extension or alleged waiver of this Agreement or any other provision hereof shall be binding upon [Ecoair] or [LaVelle] unless in writing and signed by both [Ecoair] and [LaVelle]."
While the defendant argues that this language requires that any subsequent agreement be in writing, the plaintiff claims any replacement can be valid whether executed or not. He has introduced an unsigned agreement, Exhibit E, and alleges it replaced the 1993 agreement.
However, the plaintiff has to prove a replacement agreement was entered into and he has not produced an executed copy of such a document. Since Mr. Knudsen denies ever signing this new agreement, the court must examine the surrounding circumstances for indications that the parties acted in accordance with its terms or in other ways to suggest they adopted its terms. It apparently originated in February of 1995.
Though a draft of an agreement was prepared by an attorney, when called as a witness the attorney had no executed copy and had no recollection of nor record of conferences about the agreement.
A co-worker of the plaintiff, Richard Crane, was active in the preparation of new employment agreements for the plaintiff and himself. He discussed terms with the attorney who prepared the draft. However, he had no executed copy indicating he had signed a new employment contract and he did not recall signing one.
In his court testimony, Crane described a meeting on February 17, 1995 CT Page 11891 with Crane and Knudsen and perhaps the plaintiff. He gave Knudsen copies of Exhibit E, the draft employment agreement along with his letter of resignation (Exhibit F). This letter raised some issues regarding termination of employment. Knudsen testified this was the first time he had seen any of these documents. Crane stated he was not sure that Knudsen agreed to all the terms in the draft agreement. However, he did agree to Crane's proposed termination without cause provision and so advised Crane and the plaintiff by letter dated February 17, 1995 (Exhibits G and H).
Subsequently, Crane entered into an agreement with Ecoair (Exhibit T) in February of 1997. This agreement recited the terms of his termination of employment, including a release and severance payments. In reciting what employment relationship the termination addressed, the first paragraph of Exhibit T refers to the 1993 employment agreement and Mr. Knudsen's 17, 1995 letter, (Exhibits G and H), noted above.
One would expect that had Crane felt he was working under the 1995 agreement, there would have been some reference to it in Exhibit T. It is also significant that the salary increments called for in the 1995 agreement were not addressed in the termination agreement — a fact admitted by Crane. Instead, he agreed to accept for 6 months an amount equal to the salary he had been paid immediately prior to the termination agreement.
The court next looks to the testimony of the plaintiff for evidence to support the execution of, "adoption" of, or ratification of the 1995 agreement.
Mr. LaVelle was unable to say which draft of the 1995 agreement he contends he signed. Drafts (Exhibits E and M) have likely dates or origin of February 16 and February 27, 1995 respectively. Yet, he testified that a prospective investor was advised of the contents in 1994. However, he later testified that the subject of amending the 1993 contract was notraised until after November 10, 1994 when Mr. Knudsen requested he resign from the Board of Directors.
In plaintiff's Exhibit V, a memo prepared by the plaintiff in 2000, the plaintiff recites that he was informed by Mr. Crane in 1994 that a new employment agreement was in effect as of January 1995 and he was given a copy. He goes on to say the investor was given a copy. That investor's transaction closed in November 1994, however, and no draft of an agreement was produced save for Exhibits E and M, both dated in 1995.
The plaintiff has not supported his claim with evidence giving rise to an assumption that the plaintiff and the defendant operated under the CT Page 11892 terms of the 1995 agreement. His version of the sequence of events is just not credible — particularly with respect to the existence of the agreement in 1994 and all the evidence pointing to its preparation in February of 1995.
The court does not find the plaintiff's explanation about the disappearance of the signed agreement credible. He suggests that he had such a copy and that it mysteriously disappeared from his file or the company's file. Crane had no signed copy and could not recall signing one, the attorney who prepared it had no record of the execution of a final draft, and no evidence was presented to support the argument that it was disclosed to the defendant's investor in 1994.
Also absent is evidence of action taken or routines followed that adhered to the alleged 1995 employment agreement, tending to support the plaintiff's allegation that the parties acted as though it were in effect.
LaVelle's salary did not remain at the $162,625.00 level. He never took the six weeks of vacation set forth in the 1995 drafts. In the first draft, Exhibit F, paragraph 4, "Compensation", an apparent annual increment of at least 15% is called for. In the margin of that draft this increase of a maximum of 15% is corrected to read "minimum". In the later draft, Exhibit M, it still reads "maximum." But it appears obvious this clause was never implemented in either form and also supports the defendant's contention that there was no agreement for a new contract.
Further evidence negating the claim that the 1995 agreement was signed or adopted is found in Exhibit G, Knudsen's letter addressing "termination without cause" and relied on by the plaintiff. (See Section II, below).
That letter parrots the contested 1995 agreement as to termination without cause and would hardly have been necessary if the parties felt they were bound by it.
The court concludes that there was no written or oral modification of the 1993 employment contract effected by a 1995 agreement, either Exhibit E or M, and that the sole modification was that contained in Exhibit G, Knudsen's February 17, 1995 letter.
Consequently, the plaintiff has not met his burden as to the first two counts of the amended complaint.
 II. CT Page 11893
The plaintiff offers an alternative theory to support a recovery, arguing that the 1993 employment agreement, augmented by Mr. Knudsen's letter of February 17, 1995 (Exhibit G), entitled him to severance pay.
The 1993 agreement, Exhibit A, provides for automatic renewal unless one party gives notice to the other of the intention not to renew. This notice must be given at least 90 days prior to the expiration of the then current one year terms. Ecoair contends this was the purpose of its Exhibit W of September 2000.
While the 1993 agreement is silent on severance pay, Exhibit G grants severance pay upon "termination without cause."
There would appear to be substantial differences between non-renewal and termination without cause, differences the parties do not dispute. Thus, if Ecoair neglected to issue the required 90 day notice, LaVelle would be assured of another year of employment with the accompanying salary and benefits. On the other hand, if Ecoair exercised its right to terminate LaVelle without cause, it could do so at any time, but would be obligated for a severance payment, per the schedule in Exhibit G.
The language in question appears to have originated in Mr. Crane's letter to Mr. Knudsen of February 17, 1995 (Exhibit F) and also addressed prior granted stock options. It is significant that it states that it modifies "the termination provisions of your agreement." Non-renewal is included under "Employment" in the 1993 agreement.
In the absence of language indicating that the original 1993 agreement's "nonrenewal" was to be replaced by the Exhibit G "termination without cause," the court concludes that there were two separate and distinct avenues available. The former was available to both employer and employee, the latter imposed the severance pay burden on the employer if it wished to end the employment on its own schedule.
The court concludes that Exhibit G did not create a severance pay requirement to the non-renewal clause of the 1993 agreement.
Though this ruling is conclusive of the issue of severance pay, the court will address a further aspect of this claim in the event an appeal of this decision is taken.
Ecoair's obligation to make these severance payments is conditioned upon its "ongoing ability to pay." The testimony of Mr. Knudsen as to the company's past, present and future appears to this court to foreclose any likelihood that there existed in September 2000 an "ongoing ability to pay." Only if Mr. Knudsen put more of his own funds into the operation CT Page 11894 would that be possible. The court sees no likelihood that a generous donor or investor would step in to make this possible. The company has operated with substantial losses and the salary schedules in effect hardly seem justified.
Exhibit BB, the Ecoair income statement further supports the conclusion that the company did not and does not now have an "ongoing ability to pay" the amounts claimed.
 III.
The plaintiff's remaining count, the third, alleges that the defendant Knudsen interfered with his employment relationship. He is accused of acting in bad faith, for personal reasons and without business justification to have the plaintiff's salary reduced and his employment terminated.
The salary issue came before the Ecoair Compensation Committee in December of 1995. In preparation for that meeting Knudsen had Mr. Crane prepare a schedule of the prior salaries of Crane, LaVelle, and Knudsen. In his submission to the committee, Knudsen requested increases in all three salaries.
However, the committee voted to reduce all three salaries, with the plaintiff's salary set at $100,000. This action rescinded the increments that became effective January 1, 1995.
Robert Fers, a member of the committee, confirmed that that was the action taken at the meeting. He also commented that it was felt Crane, Knudsen, and LaVelle "were less than on top of things." When the recommendation was presented to the Ecoair Board of Directors at its meeting of January 24, 1996, it was adopted unanimously. Both Mr. LaVelle and Mr. Crane were present.
There was no evidence presented to even suggest that Mr. Knudsen acted as alleged in reducing Mr. LaVelle's salary. In fact, the opposite is true in that he attempted to obtain raises for LaVelle and Crane.
Similarly, the plaintiff has produced nothing to support the allegations as to the termination of LaVelle's employment. Mr. Knudsen was told by the Board of Directors that payroll had to be cut, even if the plaintiff and another employee had to be terminated. References to reducing monthly costs (basically, only salaries were left) is found in Exhibit KK, the minutes of the August 7, 2000 meeting.
Knudsen then told the plaintiff of the board action, but did not take CT Page 11895 any further action until some further re-financing was attempted. When this was unsuccessful, both employees were terminated and Knudsen took a further cut. He has been serving without compensation since November of 2000.
Lacking credible evidence to contradict this sequence of events, the court is obliged to find for the defendant Knudsen on the third count.
 IV.
The defendant Knudsen has counterclaimed against the plaintiff, seeking to recover $78,000 that he loaned to LaVelle in 1996.
The plaintiff admits that Knudsen loaned him $78,000, but argues that under the terms of the loan, it was made without interest and became due and payable upon LaVelle's sale of his stock in Ecoair. LaVelle has not sold any shares held in his name, but has received $90,000 from the sale of shares held in the names of his daughters and $70,000 from the sale of shares held by one George Lewis.
Thus, LaVelle argues, having not sold his shares, he is not obligated to repay the loan. And, to carry this theory to its conclusion, he can avoid payment indefinitely and never have to repay the loan simply by not selling the shares in his name.
The defendant has cited in opposition to the plaintiff's argumentCorbin on Contracts (Rev. Ed. 1993) § 5.28, p. 142. Referring to an illusory promise, this text defines the same as "words in promissory form that promise nothing." An example would be a condition in a contract completely under the control of the promisor. That would certainly appear to be the case here where LaVelle controls when the debt becomes payable, or claims he can prevent it from ever becoming payable.
In a case cited by the defendant, our Appellate Court, citing Corbin, supra, pages 149-50, has said:
 "An implied obligation to use good faith is enough to avoid the finding of an illusory promise." Sicaras v. Hartford, 44 Conn. App. 771, 781 (1997).
The court cannot find this plaintiff acted in good faith in entering into the loan agreement which permitted him to unreasonably delay or totally avoid payment.
The plaintiff's agreement to pay when his shares are sold is found to be an illusory promise and is unenforceable. CT Page 11896
It could not have been the intention of the parties when the loan was made to produce an inequitable result which shocks the conscience, particularly where LaVelle has sold or caused to be sold other shares he controlled, retaining proceeds of $160,000.
Even if one adopts the plaintiff's argument that the payment date arrives when the shares in the plaintiff's name are sold, in the absence of any specific time limit for that to occur, the loan should certainly be repaid within a reasonable time.
The plaintiff has had the use of $78,000 for five years, the defendant has received no interest, and the debt is unsecured.
The court concludes that applying equitable principles, the debt is now due and payable.
Judgment may enter for the defendant Peter Knudsen on the counterclaim in the amount of $78,000.
 V.
There remains in dispute the question of whether the amount advanced by Ecoair to pay the plaintiff's health insurance premiums should offset the amount due the plaintiff for nine vacation days, $3,636.34. This figure is not disputed.
Relying on the testimony of Mr. Wisot, the court concludes that it should. The plaintiff did not give Ecoair notice to end his coverage and Ecoair made the payments which created a benefit available to the plaintiff, though he may not have enjoyed the actual use of it.
The court concludes the plaintiff is entitled to the balance of $151.63 offered by the defendant.
 CONCLUSION
Judgment may enter for the defendants on counts one, two and three. Judgment may enter for defendant to recover of the plaintiff $78,000 on his counterclaim.
By the Court,
Anthony V. DeMayo, J.T.R.